IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATURAL JUICE COMPANY, an Illinois corporation, | ) | MAGISTRATE SIDNEY I. SCHENKIER |
| Plaintiff, | ) | 03C 9154 |
| | ) | |
| v. | ) | No. |
| | ) | |
| ORCHID ISLAND JUICE COMPANY, a Florida corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF REMOVAL

Defendant Orchid Island Juice Company, by its attorneys, Bell, Boyd & Lloyd

LLC, hereby gives notice of its removal of this action from the Circuit Court of Cook County in

the State of Illinois to the United States District Court for the Northern District of Illinois, and in

support thereof respectfully states as follows:

1.      This action was commenced on October 31, 2003 in the Circuit Court of

Cook County, Illinois. Plaintiff filed an Amended Complaint ("Amd. Cmplt.") on November

13, 2003. A copy of the summons and Amended Complaint, as filed and served upon Defendant

on November 20, 2003, are attached hereto as Exhibit A.

2.      This is a civil action filed by Plaintiff, as distributor, arising from an

exclusive distribution and supply contract it entered into which included Defendant as one of its

suppliers. The Amended Complaint contains two counts: Count I labeled Breach of Contract;

and Count II labeled Declaratory Judgment. Plaintiff alleges that Defendant breached its

contract with Plaintiff by refusing to accede to and perform according to Plaintiff's interpretation

of the contract terms. Plaintiff seeks to recover damages including a termination fee of $2.5

million. Plaintiff also seeks a declaration that its interpretation of the contract is correct.

1 – 1

3. Defendant seeks removal of the action to this Court under 28 U.S.C. § 1441, *et seq.*, on the grounds that the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the action is between citizens of different states. Thus, this Court has original jurisdiction over Plaintiff's action pursuant to 28 U.S.C. § 1332.

4. This is an action brought in name of Plaintiff Natural Juice Company, an Illinois corporation with its principal place of business in Wood Dale, Illinois.

5. Defendant Orchid Island Juice Company is a Florida corporation with its principal place of business in Fort Pierce, Florida.

6. The matter in dispute exceeds the sum of $75,000, exclusive of interest and costs. Plaintiff is seeking "Damages in an amount to be proved at trial, including an award of the termination fee of $2.5 million, and other damages caused by Orchid's breaches of the Agreement." Amd. Cmplt. ¶ 39(a).

7. Defendant is filing this Notice of Removal within thirty (30) days after the receipt of a copy of the initial pleading setting forth the claim for relief upon which this action is based as required by 28 U.S.C. § 1446(b). The summons was issued November 13, 2003 and Defendant was served with the Amended Complaint on November 20, 2003. (The original Complaint was never served.)

11. This is the United States District Court for the District and Division encompassing the place where the state court action is pending. It is, therefore, the appropriate court for removal.

12. A copy of this Notice of Removal is being filed with the Clerk of the Court of the Circuit Court of Cook County, Illinois as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendant Orchid Island Juice Company hereby removes this action from the Circuit Court of Cook County, Illinois to this Court for further proceedings as though this action originally had been instituted in this Court.

Dated: December 18, 2003.

Respectfully Submitted,
ORCHID ISLAND JUICE COMPANY

By: _____
One of Its Attorneys

Peter G. Rush
Paul J. Walsen
Abram I. Moore
BELL, BOYD & LLOYD LLC
Three First National Plaza
70 West Madison Street
Suite 3000
Chicago, Illinois 60602
(312) 372-1121

367301/E/1

3

## CERTIFICATE OF SERVICE

Abram I. Moore, an attorney, hereby certifies that he caused a copy of **Defendant**

**Orchid Island Juice Company's Notice of Removal**, to be served upon:

> Peter A. Silverman
> Figliulo & Silverman, P.C.
> 10 S. LaSalle Street, Suite 3600
> Chicago, IL 60603

by facsimile and messenger delivery this 18th day of December, 2003.

Abram I. Moore

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **SUMMONS** | **ALIAS - SUMMONS** |

(Rev.12/3/01) CCG 0001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, <u>CHANCERY</u>_____ DIVISION

(Name all parties)

NATURAL JUICE COMPANY

v.

ORCHID ISLAND JUICE COMPANY

No. <u>03 CH 18328</u>

Please serve:

Orchid Island Juice Company
c/o Richard M. Carnell
1900 Old Dixie Hwy
Fort Pierce, FL 34946

### SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room <u>802</u>_____, Chicago, Illinois 60602

❑ District 2 - Skokie
   5600 Old Orchard Rd.
   Skokie, IL 60077

❑ District 3 - Rolling Meadows
   2121 Euclid
   Rolling Meadows, IL 60008

❑ District 4 - Maywood
   1500 Maybrook Ave.
   Maywood, IL 60153

❑ District 5 - Bridgeview
   10220 S. 76th Ave.
   Bridgeview, IL 60455

❑ District 6 - Markham
   16501 S. Kedzie Pkwy.
   Markham, IL 60426

You must file <u>within 30 days</u> after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than <u>30 days</u> after its date.

Atty. No.: <u>34435</u>_____

Name: <u>Peter A. Silverman, Figliulo & Silverman, P.C.</u>

Atty. for: <u>Plaintiff</u>_____

Address: <u>10 S. LaSalle Street, Suite 3600</u>

City/State/Zip: <u>Chicago, IL 60603</u>

Telephone: <u>312.251.4600</u>

WITNESS, _____,

NOV 13 2003

_____

Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

_____ (Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

NATURAL JUICE COMPANY,      )
                            )
    Plaintiff,              )
                            )
    v.                      )
                            )    Case No.  03 CH 18328
                            )
ORCHID ISLAND JUICE COMPANY,)    Judge McGann
                            )
    Defendant.              )

## AMENDED COMPLAINT

Plaintiff, Natural Juice Company ("Natural"), by its attorneys, for its complaint against defendant Orchid Island Juice Company ("Orchid"), states as follows:

### Introduction

1.     Natural distributes fresh squeezed citrus juices. It operated under an exclusive supply agreement with Orchid's predecessor containing very favorable price terms. When Orchid became associated with Natural's supplier, Orchid attempted to renege on the favorable price terms that Natural was entitled to under contract. Natural filed a prior action to enforce its rights. The parties entered into a revised agreement which again contained favorable pricing terms for the benefit of Natural, which induced Natural to dismiss its claims. The revised agreement provides that if Orchid terminates the revised agreement without cause, Natural must be paid a termination fee of $2.5 million.

2.     Orchid is now again attempting to avoid selling products to Natural at the agreed price. Orchid is in breach of the revised agreement and has repudiated the agreement. Natural seeks a declaration from this Court that Orchid has terminated the revised agreement without cause, entitling Natural to the termination fee.

## The Parties

3.      Upon information and belief, defendant, Orchid Island Juice Company is a corporation organized and existing pursuant to the laws of the State of Florida having its principal place of business in Fort Pierce, Florida. Orchid is in the business of manufacturing and packaging fresh squeezed fruit and vegetable juice products and related items.

4.      Plaintiff, Natural Juice Company is a corporation organized and existing pursuant to the laws of the State of Illinois having its principal place of business in Wood Dale, Illinois. Natural is in the business of selling and distributing fresh squeezed fruit and vegetable juice products and related items.

## Jurisdiction and Venue

5      Jurisdiction is proper pursuant to 735 ILCS 5/2-209 because the defendant is a corporation doing business within the State of Illinois and because the parties' contract which is the subject of this action was entered into in Illinois.

6      Venue is proper pursuant to 735 ILCS 5/2-101 because some of the transactions out of which the causes of action arise occurred in Cook County, Illinois.

7      On or about March 31, 1996, Natural's principal sold his manufacturing and packaging facilities located in Florida to Fresh Juice Company ("FJC"). In connection with and as part of that transaction, Natural and FJC entered into an Agreement dated as of March 31, 1996 (the "Agreement"). The benefits flowing to Natural under the Agreement were a material part of the entire transaction.

8.      Under the Agreement, Natural was entitled to an exclusive distributorship. It was provided that Natural would purchase product on a "cost plus $1.00" basis, which was very favorable

2

to Natural.

9       On or about January 29, 1999, FJC was sold to Saratoga Beverage Group ("Saratoga"). Pursuant to the terms of the Agreement, Saratoga was bound as a successor and assign to honor FJC's obligations under the Agreement.

10      On or about June 21, 2000, Saratoga was itself purchased by North Castle Partners, L.L.C. ("North Castle"). Pursuant to the terms of the Agreement, North Castle was likewise bound as a successor and assign to honor FJC's obligations under the Agreement.

11      In or about October 2000, North Castle purchased Orchid, another manufacturer and packager of fresh squeezed juice products. The manufacturing and packing operations of FJC /Saratoga/North Castle were consolidated with that of Orchid.

12      The purchases of Fresh Juice, Saratoga and Orchid by North Castle were part and parcel of its aggressive campaign to consolidate the juice industry and combine the various companies' distribution, manufacturing and procurement functions.

13      While North Castle wished to consolidate its juice operations, it remained bound to the terms of the Agreement as successors and assigns.

14      FJC and Orchid, through their combined manufacturing and packaging operations, stated their intention to ignore the exclusivity provision in the parties' contract.

15      Contrary to the parties' intentions and the course of performance under the Agreement over 4½ years, FJC claimed that additional "cost" items should be included in calculating the "cost plus $1.00" price per gallon of juice under the Agreement, which would increase the price to Natural by approximately forty percent.

16      As a result of FJC's sale to other distributors in the Territory, Natural provided FJC

3

with written notice of this breach of the exclusive territory provision in the Agreement.

17    FJC failed to correct its breach of the exclusivity provision of the Agreement.

18    Natural filed suit against Orchid and other defendants, Case No. 00 CH 18377 (which was removed to federal court).

19    The parties settled the litigation. In connection with the settlement, the parties entered into an amended and restated exclusive supply and independent distributor master agreement dated February 27, 2001 ("Revised Agreement"), which was a material inducement to Natural to dismiss its claims in case No. 00 CH 18377. The Revised Agreement is attached hereto as exhibit 1.

20.    Under the Revised Agreement, Natural was again entitled to favorable cost terms on a "cost plus" $1.30 basis (Exhibit 1, Par. 4(a)(ii)).

21.    The parties performed under the Revised Agreement throughout the year 2001.

22.    In the year 2002, Natural audited Orchid's cost information pursuant to the Revised Agreement (Exhibit 1, Par. 4(a)(i)).

23.    The audit revealed that, based on Orchid's own records, Natural had been overcharged in the amount of $113,101.08. Orchid began providing credits to Natural to pay down the amount of the overcharge.

24.    In or about February 2003, Orchid was again sold back to a group which included its original owner. Upon information and belief, the new owners did not want to purchase Orchid subject to the Revised Agreement (because it is favorable to Natural), but that was a required condition of sale.

25.    The credits continued to be provided to Natural reducing the overcharges to $33,101.08. The credits then stopped, leaving a balance due to Natural of $33,101.08, which is due

4

as of the filing of this Complaint.

26.     In or about March 2003, Orchid took the position that certain credits paid to Natural, in the amount of $40,605.96, needed to be returned by Natural. It is the position of Orchid that there was no overcharging and that the costs charged to Natural were accurate.

27.     Orchid has provided no information to support its position, despite repeated requests by Natural's representatives, in violation of the Revised Agreement.

28.     Orchid is clearly attempting to again avoid Natural's favorable price terms.

29.     Orchid has also taken the position that if Natural will not negotiate its pricing, Orchid will supply product from third party vendors. That is a clear breach of its duty to supply its own juice when commercially feasible (Exhibit 1, Par. 5).

30.     On October 31, 2003, Natural demanded reasonable assurances from Orchid that it would perform under the Revised Agreement by paying the amounts owed to Natural and by honoring the price terms under the Revised Agreement (exhibit 2).

31.     On November 4, 2003, Orchid generically responded that it intended to perform, without providing any reasonable assurances (exhibit 3).

32.     Representatives of the parties attended a meeting on or about November 12, 2003. Orchid's representatives stated that they were unwilling to pay the $33,101.08 owed to Natural and that Orchid would not sell products to Natural at the price set forth in the Revised Agreement.

33.     Natural advised Orchid that it would use an alternative supplier as a result of Orchid's repudiation and breach of the Revised Agreement, and that Natural would pursue available remedies against Orchid (exhibit 4).

34.     Natural is entitled to a termination fee of $2.5 million dollars in the event of Orchid's

5

termination of the Revised Agreement without cause (Exhibit 1, Par. 17).

## COUNT I
### (Breach of Contract)

35.     Natural realleges and incorporates by reference herein paragraphs 1 through 34 as paragraph 21 of this Count I.

36.     Orchid has breached the Agreement by failing to provide juice products to Natural at the price established according to the terms of the Revised Agreement and the course of performance of the parties.

37.     Orchid has breached the covenant of good faith and fair dealing by failing to provide juice products to Natural at the price established according to the terms of the Revised Agreement and the course of performance of the parties.

38.     Orchid has wrongfully repudiated the Revised Agreement by refusing to provide adequate assurances of its performance under the Revised Agreement.

39.     Natural has substantially performed all of its obligations under the Agreement.

WHEREFORE, Natural requests the following relief:

(a)     Damages in an amount to be proved at trial, including an award of the termination fee of $2.5 million, and other damages caused by Orchid's breaches of the Agreement;

(c)     such other and further relief as this Court deems just and proper.

## COUNT II
### (Declaratory Judgment)

40.     Natural realleges and incorporates by reference herein paragraphs 1 through 34 as paragraph 36 of this Count II.

6

41.     An actual controversy exists regarding the proper calculation of the price term under the Agreement and whether Orchid may supply products from third parties.

42.     This controversy is a dispute capable of immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of said controversy.

WHEREFORE, Natural requests the following relief:

(a)     an order declaring that Orchid must supply juice products according to the price term contained in the Revised Agreement and established by the parties' course of performance, namely $1.30 per gallon over Orchid's cost of production with such costs including only (i) the cost of the fruit and (ii) the cost of packaging.

(b)     an order declaring that Orchid must supply its own products when commercially feasible;.

(c)     an order declaring that Orchid is in breach of the Revised Agreement and awarding Natural its damages, including the $2.5 million termination fee; and

(d)     such other and further relief as this Court deems just and proper.


**NATURAL JUICE COMPANY**

By: _____

One of its Attorneys

Peter A. Silverman
FIGLIULO & SILVERMAN, P.C.
10 South La Salle Street
Suite 3600
Chicago, Illinois 60603
(312) 251-4600
Firm No. 34435

EXECUTION COPY

## AMENDED AND RESTATED EXCLUSIVE SUPPLY AND INDEPENDENT DISTRIBUTOR MASTER AGREEMENT

THIS AMENDED AND RESTATED EXCLUSIVE SUPPLY AND INDEPENDENT DISTRIBUTOR MASTER AGREEMENT (this "Agreement") is entered into as of this 27th day of February, 2001, by and among THE FRESH JUICE COMPANY, a Delaware corporation ("Fresh Juice"), ORCHID ISLAND JUICE COMPANY, a Florida corporation ("Orchid Island"), CALIFORNIA DAY-FRESH FOODS, INC., a California corporation ("CDF"), FANTASIA FRESH JUICE COMPANY, an Illinois corporation ("Fantasia") and M. H. ZEIGLER AND SONS, INC., a Pennsylvania corporation ("MHZ" and together with Fresh Juice, Orchid Island, CDF and Fantasia, the "COMPANIES"), and NATURAL JUICE COMPANY, an Illinois corporation ("DISTRIBUTOR").

### RECITALS

A.   Fresh Juice and DISTRIBUTOR are parties to an agreement, dated as of March 31, 1996 (the "Original Agreement"), with respect to the distribution of Fresh Juice's Products (as hereinafter defined) in the Chicago, Illinois and Milwaukee, Wisconsin markets.

B.   Fresh Juice has undergone a change of control and a reorganization as a result of which it has acquired several new affiliates, including Orchid Island, CDF and Fantasia. The primary business of the COMPANIES consists of the manufacture and distribution of both fresh and pasteurized refrigerated citrus juice, other refrigerated fruit juices and blended juice products, and bottled water (the "Companies' Business"). The COMPANIES constitute all of the affiliated companies engaging in the Companies Business that currently offer products in the Territory, it being understood that the parties intend to amend this Agreement as necessary to add any new affiliates of the COMPANIES that may in the future manufacture or distribute refrigerated juice in the Territory.

C.   DISTRIBUTOR now desires to amend and restate the Original Agreement in order to:  (i) secure a source of supply for all of its requirements of Products from the COMPANIES for resale to DISTRIBUTOR's Customers (as hereinafter defined) under DISTRIBUTOR's label and (ii) to act as an independent distributor in the Territory (as hereinafter defined) with respect to the COMPANIES' Branded Products (as hereinafter defined) and certain of their Additional Products (as hereinafter defined) to DISTRIBUTOR's Customers and to certain House Accounts (as hereinafter defined).

D.   Fresh Juice desires to amend and restate the Original Agreement and each of the other COMPANIES desires to enter into such agreement as amended and restated

**1**

in order to act as DISTRIBUTOR's source of supply of Products and to appoint DISTRIBUTOR as their independent distributor for Branded Products and Additional Products in the Territory on the terms set forth in this Agreement and, with respect to Additional Products only, also on the terms set forth in supplemental memoranda into which the COMPANIES and DISTRIBUTOR may enter into from time to time.

NOW, THEREFORE, in consideration of the covenants and conditions made herein, the parties hereby agree as follows:

1.     EXCLUSIVE SUPPLY; CERTAIN DEFINITIONS.

(a)     Product Sales.  DISTRIBUTOR agrees to purchase from the COMPANIES and the COMPANIES agree to sell to DISTRIBUTOR in accordance with the terms hereof all of DISTRIBUTOR's requirements of Products for resale to Customers in the Territory.  DISTRIBUTOR will use commercially reasonable efforts to increase sales of Products to Customers in the Territory and otherwise operate in accordance with best business practices for the refrigerated beverage industry.  Except as otherwise permitted by this Agreement DISTRIBUTOR will not (i) purchase any Products from any supplier other than the COMPANIES; (ii) without the prior written consent of the COMPANIES, re-sell Products to any Customer or to any other party if there is a reasonable likelihood that such Products will be delivered for sale outside of the Territory; or (iii) sell any Products to any House Account or to any grocery or mass retail chain, including supermarkets, superstores and wholesale clubs.  During the term of this Agreement, except as otherwise permitted hereby, the COMPANIES will not distribute or permit the distribution or sale of any Products manufactured or distributed by the COMPANIES or under their direction to any Customers in the Territory.

(b)     Packaging.  All Products sold to DISTRIBUTOR hereunder, other than Branded Products, will be delivered to DISTRIBUTOR or in packaging selected by DISTRIBUTOR from various packaging alternatives offered by the COMPANIES with the label "Natural Juice" or such other label as DISTRIBUTOR may from time to time request, using logos, trademarks or other intellectual property validly owned or licensed by DISTRIBUTOR.

(c)     Certain Definitions and Rules of Construction.  As used in this Agreement:

(i)     the term "Additional Products" means all refrigerated juices (other than citrus juice) and blended juice products, and bottled water, whether now or hereafter manufactured or distributed by the COMPANIES and that contain Company Intellectual Property;

2

(ii)    the term "Branded Products" means all Products containing Company Intellectual Property or private labels whether now or hereafter manufactured or distributed by the COMPANIES that are intended for distribution to House Accounts;

(iii)    the term "Company Intellectual Property" means the COMPANIES' trademarks and trade names listed in the Exhibit A (as amended from time to time by the COMPANIES);

(iv)    the term "Customers" means all food service and institutional accounts (including hotels, restaurants, jails, churches and corporate cafeterias) that purchase Products in the Territory for resale to the extent such Products are poured by such accounts to their customers, other than: (x) House Accounts; (y) accounts that DISTRIBUTOR elects not to service and (z) all schools and all grocery and mass retail chains, including supermarkets, superstores and wholesale clubs;

(v)    the term "House Accounts" means accounts that would otherwise be deemed to be "Customers" above (but for their exclusion from such definition as House Accounts) and (x) that purchase Products for delivery in the Territory through centralized national or regional buying offices or distribution centers in annual amounts not exceeding the amount of Products purchased for delivery outside of the Territory; or (y) for which orders for Products originate outside the Territory; or (z) accounts that request to deal directly with the COMPANIES, request that a distributor other than DISTRIBUTOR service them or request an alternative distribution or delivery method for Products;

(vi)    the term "Non-Compete Products" means Products, Branded Products, blended juice products (also known as "Smoothies") manufactured or distributed by the COMPANIES, apple juice manufactured or distributed by the COMPANIES (provided that such apple juice is competitively priced) and any product that if manufactured or distributed by the COMPANIES, would compete with a product manufactured or distributed by Odwalla Inc. or its affiliates, successors or assigns;

(vii)    the term "Products" means refrigerated fresh (unpasteurized) citrus juice products, including orange juice, grapefruit juice, lemon juice, lime juice, lemonade and limeade and, should the COMPANIES determine in their sole discretion to manufacture only pasteurized or otherwise treated citrus juice, such pasteurized or otherwise treated citrus juice;

3

(viii)   the term "Territory" means the greater Chicago metropolitan area, the surrounding six collar counties and the greater Milwaukee metropolitan area; and

(ix)   the terms "include(s)" and "including" are deemed to be followed by the words "without limitation."

2.      APPOINTMENTS.

(a)   Branded Products.  For so long as this Agreement is in effect and subject to and in accordance with its terms and conditions, (i) the COMPANIES hereby appoint DISTRIBUTOR, on a non-exclusive basis, as their distributor to distribute Branded Products to the House Accounts in the Territory and (ii) the COMPANIES will supply to DISTRIBUTOR such quantity of Branded Products as DISTRIBUTOR may require from time to time to service the House Accounts hereunder.

(b)   Additional Products.  The COMPANIES also appoint DISTRIBUTOR, on a non-exclusive basis, as their distributor to distribute Additional Products in the Territory to Customers and to other accounts other than to grocery and mass retail chains, including supermarkets, superstores and wholesale clubs.  DISTRIBUTOR will distribute such Additional Products in accordance with the terms and conditions of this Agreement, except that the specific Additional Products and any variation from the terms and conditions of this Agreement according to which they otherwise would be distributed will be set forth in supplemental memoranda.  The terms and conditions (including pricing terms) contained in the supplemental memoranda for Additional Products will be no less favorable to DISTRIBUTOR than those in accordance with which the COMPANIES sell such Additional Products for distribution in the Territory.  In no event will any supplemental memorandum be deemed to amend, modify or supplement any of the terms and conditions of this Agreement with respect to any Products, Branded Products or Additional Products other than those described therein.  Prior to the date hereof, the COMPANIES have not granted, and after the date hereof will not grant, any exclusive distribution rights to any other distributor with respect to Additional Products in the Territory.

(c)   Reservation of Distribution Rights.  DISTRIBUTOR acknowledges and agrees that neither the House Accounts nor other accounts that DISTRIBUTOR elects not to service will be deemed to be "Customers" hereunder.  In accordance with the terms hereof, the COMPANIES reserve the right to distribute in the Territory directly or through distributors other than DISTRIBUTOR (i) Branded Products to House Accounts that DISTRIBUTOR has elected not to service or that request to deal directly with the COMPANIES, request that a distributor other than DISTRIBUTOR service them or request an alternative distribution or delivery method for Products, (ii) Additional Products to any account and (iii) Products (including Branded Products) to other accounts

4

that are not Customers, but at prices no less favorable than those available to DISTRIBUTOR hereunder.

(d)     Acceptance of Appointments.  DISTRIBUTOR hereby accepts the foregoing appointments.  DISTRIBUTOR further agrees to use commercially reasonable efforts to promote, sell, distribute and deliver the Branded Products and the Additional Products within the Territory to the Customers and to the House Accounts in accordance with this Agreement, and to conduct business in a manner so as to promote and enhance the reputation and goodwill of the COMPANIES, the Branded Products and the Additional Products.  DISTRIBUTOR will at all times service the accounts to be serviced by DISTRIBUTOR hereunder in accordance with the terms and conditions of this Agreement.  Other than in accordance with this Agreement, without the prior written consent of the COMPANIES, DISTRIBUTOR will not permit any Customer or House Account to be serviced with Branded Products or Additional Products by any other person or entity.  Notwithstanding the foregoing, in the event DISTRIBUTOR is unable to distribute Branded Products or Additional Products in accordance with the terms hereof, DISTRIBUTOR may, on a short-term, temporary basis only, retain the services of another distributor that is already under contract with and providing services to the COMPANIES to distribute such Branded Products and Additional Products on behalf of DISTRIBUTOR for no more than five days per calendar year in the aggregate.

3.     HOUSE ACCOUNTS; COMMISSIONS; OTHER ACCOUNTS.

(a)     House Accounts.  The COMPANIES will use commercially reasonable efforts to direct service of House Accounts in the Territory to DISTRIBUTOR.  Upon a request by the COMPANIES to service any House Account, DISTRIBUTOR may elect not to service such House Account.  Six months after DISTRIBUTOR has declined to service any House Account, the COMPANIES will re-offer such House Account to DISTRIBUTOR, which DISTRIBUTOR may then elect to service within five business days of such offer.  DISTRIBUTOR will service House Accounts that it has agreed to service, in accordance with the terms and conditions hereof and in accordance with the respective agreements between such House Accounts and the COMPANIES, including the product price and service provisions of such agreements.  In no event will DISTRIBUTOR service any House Account with Products that are not Branded Products.  House Accounts that DISTRIBUTOR has elected not to service may be serviced by the COMPANIES directly or by a distributor other than DISTRIBUTOR.

(b)     Commission.  Except as provided below, the COMPANIES will pay DISTRIBUTOR a commission equal to 10% of the net proceeds received by the COMPANIES within 30 days of receipt thereof for sales of Branded Products in the Territory to House Accounts serviced by the COMPANIES directly or by a distributor other than DISTRIBUTOR.  Notwithstanding the foregoing, in no event will

5

DISTRIBUTOR be entitled to any commission with respect to the sale of any Branded Products to a House Account that DISTRIBUTOR elects not to service.

    (c)    <u>Sysco and Finer Foods</u>. For purposes of clarity, accounts with or served by Sysco located in the Territory will be deemed to be House Accounts hereunder and accounts with or served by Finer Foods located in the Territory will be deemed to be Customers hereunder, each to be serviced by DISTRIBUTOR in accordance with the terms hereof.

    (d)    <u>First Seasons</u>. Notwithstanding anything to the contrary herein, the COMPANIES may continue to supply Products to First Seasons Company ("<u>First Seasons</u>") for resale and distribution to Customers in the Territory for a period of 30 days, commencing the date hereof. No commission will be payable to DISTRIBUTOR with respect to sales of Products to First Seasons during the transition period. After the termination of such period, the COMPANIES will discontinue supplying Products to First Seasons for resale and distribution to Customers in the Territory.

    4.    PRICE; DELIVERY AND TERMS.

    (a)    <u>Price</u>. The price for all Products (including Branded Products) sold to DISTRIBUTOR hereunder, whether for resale to Customers or to House Accounts, will equal (x) the cost of raw materials incurred to produce or acquire such Products, *plus* (y) the Margin.

    (i)    <u>Cost of Raw Materials</u>. For Products delivered by any of the COMPANIES to DISTRIBUTOR, the cost of raw materials will equal the cost of fruit, packaging materials (including the cost of any plastic jug or other container, any caps or other sealer and corrugated boxes) and labeling materials, but will not include any costs associated with utilities, labor, COMPANY taxes, squeezing fruit, pouring juice into appropriate packaging or adhering labels, but will include, if applicable for pasteurized or otherwise treated Products, the cost of any pasteurization or other treatment process. For Products acquired from third-party suppliers for delivery to DISTRIBUTOR, the cost of raw materials will be deemed to be the cost of such Products payable to such third-party supplier. By written notice to DISTRIBUTOR the COMPANIES will adjust the cost of raw materials every six months based on the average cost of such raw materials incurred or paid by the COMPANIES over the preceding 60-day period. Upon request, the COMPANIES will provide DISTRIBUTOR reasonable evidence of the cost of raw materials, including <u>evidence regarding gallon reports, fruit invoices and Florida Department of Agriculture on site test reports, as well as</u> any evidence the COMPANIES have regarding margins included in the cost of Products acquired from third-party suppliers.

(ii)   Margin.  With respect to Products supplied by the COMPANIES'
Florida-based manufacturing facility only, the Margin initially, and for a period
ending eight months from the date hereof, will equal $1.00 per gallon of Product
delivered to DISTRIBUTOR, after which period, the Margin will equal $1.30 per
gallon of Product delivered to DISTRIBUTOR. The Margin for Products
supplied by any California-based production facility of any COMPANY (or by
any other production facility of any COMPANY) at all times during the term of
this Agreement will equal $1.30 per gallon of Product delivered to
DISTRIBUTOR. The Margin for Products supplied by third-party suppliers for
the benefit of DISTRIBUTOR will equal the positive difference between (x)
$1.30 per gallon of Product delivered to DISTRIBUTOR, minus (y) any margin
payable to the third-party supplier that is included in the cost of raw materials in
Section 4(a)(i) above.  If such third-party supplier's margin exceeds $1.30 per
gallon of Product delivered to DISTRIBUTOR, no Margin will be payable to any
of the COMPANIES and DISTRIBUTOR may take delivery of such Products
directly from such third-party supplier (and if DISTRIBUTOR so takes delivery,
no cost of raw materials for such Products will be payable to any of the
COMPANIES).  By way of example:  if a third party supplier charges $4.00 for a
gallon of orange juice delivered and such price includes a margin payable to such
supplier of $1.25, then DISTRIBUTOR would pay the COMPANIES $4.05 per
gallon of orange juice delivered ($4.00 ÷ ($1.30 - $1.25)).  Conversely, if such
third party's margin were equal to $1.30 per gallon or greater, DISTRIBUTOR
could elect to take delivery of such orange juice directly from such third party
supplier and pay the COMPANIES nothing.  Notwithstanding anything to the
contrary in this paragraph, DISTRIBUTOR will be credited for any remaining
time under the eight-month period above when shipments of Product resume from
Orchid Island.

(b)   Terms of Delivery; Payment Terms; Default.

(i)   DISTRIBUTOR will take delivery of all Products (unless acquired
directly from a third-party supplier in accordance herewith) F.O.B., production
facility of the COMPANY providing the Products.  Upon delivery,
DISTRIBUTOR will take title to and have sole responsibility for the Products.
DISTRIBUTOR will pay all taxes, duties, insurance, and freight charges related
to the Products.  After delivery of Products in accordance with the terms hereof,
DISTRIBUTOR acknowledges and agrees that none of the COMPANIES will
have further responsibility or other liability (other than product liability or other
liability imposed by applicable law) with respect to Products to DISTRIBUTOR
or to any Customer or House Account serviced by DISTRIBUTOR under this
Agreement.

(ii)     Unless otherwise agreed by the parties in writing, DISTRIBUTOR will pay the COMPANY from which Product is purchased for all Products delivered to DISTRIBUTOR hereunder within 30 days of the date of delivery. Amounts outstanding that are not paid in accordance with this Section 3(b)(ii) will accrue interest until paid at a monthly rate equal to the lesser of (x) 1.5% and (y) the maximum rate permitted by applicable law.

(iii)     If DISTRIBUTOR defaults on the payment of any amount due to any of the COMPANIES whether under this Agreement or under any other written or oral agreement between DISTRIBUTOR and any of the COMPANIES, including any promissory notes or other indebtedness at any time owed by DISTRIBUTOR to any of the COMPANIES, or in the performance of any other obligation hereunder or thereunder, such COMPANY may, in its sole discretion, terminate this Agreement and accelerate the maturity of any outstanding principal indebtedness, or both, and otherwise exercise all other rights and remedies available to any of the COMPANIES herein and under applicable law without any further liability or obligation. Except as otherwise expressly set forth herein, DISTRIBUTOR hereby waives notice of demand for payment of any indebtedness owed hereunder for Products (including Branded Products) or for Additional Products hereunder. DISTRIBUTOR acknowledges and agrees that a default by Distributor under any other agreement with any of the COMPANIES will be a default under this Agreement, and that a default by DISTRIBUTOR under this Agreement will be deemed a default under each other agreement between DISTRIBUTOR and each of the COMPANIES.

(c)     Purchase Orders.  DISTRIBUTOR will purchase Products in accordance with purchase orders mailed, faxed or delivered electronically to any of the COMPANIES, which purchase orders must specify the name of the Products (including Branded Products), quantity, delivery date and price. If any terms or conditions contained in any purchase order are additional to, different from or in conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement will control, and such additional, different or conflicting terms and conditions will be null and void. The COMPANIES each reserves the right to accept or reject any purchase order for a valid business reason. As used herein "valid business reason" includes (i) anything in a purchase order that purports to modify the terms hereof; or (ii) the non-receipt by the COMPANIES of any payment from DISTRIBUTOR when due whether hereunder or otherwise. Each of the COMPANIES will use commercially reasonable efforts to fill purchase orders as soon as practicable. None of the COMPANIES will be liable for any lost commissions, profits or sales or for any losses or damages as a result of failure or delay in filling any purchase order.

5.     SUPPLY OF PRODUCTS; COMPANIES' OBLIGATIONS.

(a)    Supply of Products. Each of the COMPANIES will use commercially reasonable efforts to supply Products to DISTRIBUTOR hereunder and, subject to the last sentence of this Section 5(a), agrees that when commercially feasible, the Products will be supplied from a COMPANY maintaining a Florida-based production facility. As seasonally appropriate, any COMPANY may refer a purchase order to another COMPANY for supply from such COMPANY's California-based production facility. In addition, any COMPANY may at any time and from time to time elect to supply to DISTRIBUTOR Products that are produced by third-party suppliers. The COMPANIES will ship Products (including Branded Products) and Additional Products to DISTRIBUTOR that are at least equal in quality to products the COMPANIES are then supplying to other distributors and House Accounts. In the event the COMPANIES fail to supply all of DISTRIBUTOR's requirements for Products hereunder for reasons other than a temporary shortfall of supply below, DISTRIBUTOR may terminate this Agreement on 90 days' prior written notice to the COMPANIES. From July 1 through November 30 each year, or from time to time during such period, DISTRIBUTOR may elect to receive, and the COMPANIES will supply, Products from a California-based facility subject to the terms of this Agreement.

(b)    Shortfall of Supply. If at any time any of the COMPANIES lacks sufficient Products to supply its own requirements, the requirements of distributors other than DISTRIBUTOR, and DISTRIBUTOR's requirements hereunder, such COMPANY will refer DISTRIBUTOR's purchase order to another COMPANY for fulfillment. If none of the COMPANIES has sufficient production capacity to fulfill DISTRIBUTOR's order, DISTRIBUTOR will be allocated Products on a pro rata basis determined by *multiplying* ($\underline{i}$) the amount (in gallons) of Product produced by all of the COMPANIES together that is available for shipment by ($\underline{ii}$) the quotient of ($\underline{x}$) the amount (in gallons) of Product DISTRIBUTOR purchased from each of the COMPANIES in the three month period preceding such shortfall, *divided by* ($\underline{y}$) the total amount (in gallons) of Product that all of the COMPANIES had available for shipment during such three-month period. Subject to Section 4 above, DISTRIBUTOR may order the remainder of its requirements from other sources until the COMPANIES are capable of providing all of DISTRIBUTOR's requirements.

(c)    Other COMPANIES' Obligations. Each of the COMPANIES will comply in all material respects with all pertinent regulations promulgated by the United States Department of Agriculture and, as applicable, the Florida Department of Citrus and other federal and state agencies regulating the manufacture and shipment of fresh citrus juice products. Each of the COMPANIES warrants the merchantability of the Products and their suitability for public consumption in accordance with applicable regulatory standards.

6.  GENERAL OBLIGATIONS AND COVENANTS OF DISTRIBUTOR. Throughout the term of this Agreement, DISTRIBUTOR agrees to perform the services under this Agreement in accordance with the following covenants.

(a)  DISTRIBUTOR will use commercially reasonable efforts to promote, advertise, market and sell the Branded Products and Additional Products to be distributed in accordance herewith within the Territory. In no event, however, without the COMPANIES' prior written consent will DISTRIBUTOR distribute or sell Branded Products or Additional Products to any Customer, to any House Account or to any other person that is reasonably likely to be delivered for sale outside of the Territory. DISTRIBUTOR may elect not to service any account in the Territory, in which event, such account will be deemed not to be a "Customer" hereunder and DISTRIBUTOR will not be entitled to any proceeds or commissions arising out of sales of Products or Additional Products to such account.

(b)  DISTRIBUTOR will maintain inventory levels sufficient to meet Customer demand and otherwise to promote and sell effectively the Branded Products and the Additional Products to be distributed in accordance herewith. DISTRIBUTOR will maintain accurate books and records of delivery and sales of Branded Products and such Additional Products, and will make such books and records available to the COMPANIES for review upon their reasonable request. DISTRIBUTOR will furnish to the COMPANIES within five days of the end of each month, and at such other more frequent times as the COMPANIES may reasonably request, reports of sales by DISTRIBUTOR of Branded Products and such Additional Products by account and market conditions related thereto.

(c)  DISTRIBUTOR will not alter in any manner the Products (including the Branded Products) or the Additional Products to be distributed in accordance herewith. DISTRIBUTOR will comply with all standards of quality control, disposition of damaged goods and best business practices for the refrigerated beverage industry, with respect to the Products (including the Branded Products) and the Additional Products, whether such practices have been established by the COMPANIES in connection with commercially reasonable quality control efforts, or imposed upon the COMPANIES contractually or by law.

(d)  DISTRIBUTOR may act as a distributor or delivery agent for other businesses. In no event, however, without the prior written consent of the COMPANIES (except as expressly contemplated hereby), will DISTRIBUTOR promote, distribute, sell or otherwise market products that compete with the Non-Compete Products. Nothing herein will limit DISTRIBUTOR's right to distribute products that do not compete with Non-Compete Products. Upon the request of the COMPANIES, DISTRIBUTOR agrees to provide a complete listing of all the companies (and the lines of products represented for each such company) that DISTRIBUTOR or any of its agents or affiliates currently or

during the term of this Agreement represents as sales agent, delivery agent, distributor or otherwise.

(e)     DISTRIBUTOR will pay to the COMPANIES any moneys collected by DISTRIBUTOR for the benefit of the COMPANIES from Customers, House Accounts or otherwise no later than five business days following the date of collection.

DISTRIBUTOR acknowledges and agrees that its performance obligations contained in this Section 6 are reasonably necessary for the promotion, sale, distribution and delivery of the Products (including the Branded Products) and the Additional Products to be distributed in accordance herewith in the Territory.

7.     NON-COMPETE COVENANT.

(a)     DISTRIBUTOR acknowledges that this Agreement confers unique benefits to DISTRIBUTOR, including exclusive distribution rights for the Branded Products in the Territory and the referral by the COMPANIES to DISTRIBUTOR of House Accounts and new business opportunities. To protect the COMPANIES against any unfair use of these benefits, during the term of this Agreement, DISTRIBUTOR will not, anywhere within the Territory, except as otherwise expressly contemplated by this Agreement, directly or indirectly, own, manage, operate, control, be controlled by or under common control with, act as an agent for, participate in or be connected in any manner with the ownership, management, operation or control of any business that is engaged in businesses that is similar to or may be competitive with the Companies' Business or that otherwise engages in the manufacture, promotion, sale, distribution or servicing, either directly or indirectly, of any product similar to or competitive with the Non-Compete Products without the prior written consent of the COMPANIES, which may be withheld in their sole discretion. Nothing herein will limit DISTRIBUTOR's ability to distribute or sell Products to Customers after the termination of this Agreement.

(b)     With respect to any account that is not serviced by DISTRIBUTOR on the date hereof and that is referred to DISTRIBUTOR by the COMPANIES, the forgoing covenant in Section 7(a) will also be effective for six months after the termination hereof: (i) in which a Termination Fee is payable to DISTRIBUTOR, or (ii) with respect to any product that is or may be competitive with the COMPANIES' apple cider products and Smoothies only, for a Termination for Cause pursuant to Section 17(b)(i), where such amounts owed have been outstanding for 60 days after such payment was due, provided that the COMPANIES continue to make available such Additional Products to DISTRIBUTOR on a C.O.D. basis during such six-month period.

8.    NON-SOLICITATION COVENANT.

(a)    During the term of this Agreement, with respect to any product that is or may be competitive with the Non-Compete Products, except as expressly otherwise contemplated hereby, DISTRIBUTOR agrees that DISTRIBUTOR will not, directly or indirectly, call or solicit, for itself or for any other person, firm, corporation or other entity that is or may be competitive with the Companies' Business, any customers or accounts of the COMPANIES located within the Territory, whether or not such customers or accounts are Customers or House Accounts serviced by DISTRIBUTOR hereunder, or customers or accounts serviced by the COMPANIES or third parties on behalf of the COMPANIES. DISTRIBUTOR acknowledges and agrees that the COMPANIES have substantial relationships with their customers and accounts, and that such customers and accounts constitute a valuable, special and unique asset of the Companies' Business.

(b)    With respect to any account that is not serviced by DISTRIBUTOR on the date hereof and that is referred to DISTRIBUTOR by the COMPANIES, the forgoing covenant in Section 8(a) will also be effective for six months after the termination hereof: (i) in which a Termination Fee is payable to DISTRIBUTOR, or (ii) with respect to any product that is or may be competitive with the COMPANIES' apple cider products and Smoothies only, for a Termination for Cause pursuant to Section 17(b)(i), where such amounts owed have been outstanding for 60 days after such payment was due, provided that the COMPANIES continue to make available such Additional Products to DISTRIBUTOR on a C.O.D. basis during such six-month period.

(c)    During the term of this Agreement, DISTRIBUTOR will not, directly or indirectly, solicit, hire, or attempt to hire any employee of the COMPANIES working with or for the COMPANIES, directly or indirectly, without the prior written consent of the COMPANIES, which may be withheld in their sole discretion. Nothing herein will prevent DISTRIBUTOR from hiring any person responding to a general solicitation, who is not then employed by the COMPANIES.

9.    CONFIDENTIALITY, NON-DISCLOSURE COVENANTS. During the term of this Agreement and thereafter, DISTRIBUTOR, agrees to use any confidential information obtained by DISTRIBUTOR concerning the Companies' Business, including trade secrets, customer lists or information concerning the manufacture, distribution and pricing of the Branded Products and the Additional Products and any other non-public information regarding the COMPANIES and the Companies' Business only in connection with performing its obligations hereunder and to maintain in strict confidence any such confidential information. As used herein, "confidential information" will not include information that is or becomes generally known to the public other than by breach of this Agreement or from a source reasonably expected to be bound by an obligation of confidentiality to the COMPANIES.

12

DISTRIBUTOR further agrees that, DISTRIBUTOR will not at any time, during the term of this Agreement or thereafter, publish to any person, firm, corporation, or other entity, either directly or indirectly, the names or addresses of any customers of the COMPANIES, including the Customers and the House Accounts serviced by DISTRIBUTOR under this Agreement or any information relating in any manner to the COMPANIES' relationships with their customers, without the prior written consent of the COMPANIES, which may be withheld in their sole discretion.

10.     RESTRICTIVE COVENANTS - GENERAL PROVISIONS.

(a)     Remedies for Breach of COMPANIES Covenant.  The parties intend that DISTRIBUTOR be given the broadest protection allowed by law with regard to the covenant by the COMPANIES set forth in Section 1(a) above to refrain from the distribution or sale of Products manufactured or distributed by the COMPANIES or under their direction to any Customers in the Territory.  In the event of any breach or a threatened breach by the COMPANIES of such covenant, DISTRIBUTOR will be entitled to an injunction restraining the COMPANIES from such breach or threatened breach.  For the purposes of obtaining equitable relief, DISTRIBUTOR need not prove, and the COMPANIES hereby acknowledge, that irreparable harm or injury will have occurred for which monetary damages will be inadequate as the result of any such breach or threatened breach of this Agreement.  Nothing herein will limit any remedies available to DISTRIBUTOR, including the recovery of damages from the COMPANIES.  Such covenant on the part of the COMPANIES should be construed as an agreement independent of any other provision of this Agreement and the existence of any claim or cause of action by the COMPANIES against DISTRIBUTOR whether predicated upon this Agreement or otherwise and will not constitute a defense to the enforcement by DISTRIBUTOR of such covenant.

(b)     Remedies for Breach of DISTRIBUTOR Covenants.  The parties intend that the COMPANIES be given the broadest protection allowed by law with regard to the restrictive covenants (non-compete, non-solicitation, confidentiality and non-disclosure provisions) set forth above.  In the event of any breach or a threatened breach by DISTRIBUTOR of any of such covenants, the COMPANIES will be entitled to an injunction restraining DISTRIBUTOR from such breach or threatened breach.  For the purposes of obtaining equitable relief, the COMPANIES need not prove, and DISTRIBUTOR hereby acknowledges, that irreparable harm or injury will have occurred for which monetary damages will be inadequate as the result of any such breach or threatened breach of this Agreement.  Nothing herein will limit any remedies available to the COMPANIES, including the recovery of damages from DISTRIBUTOR.  These covenants on the part of DISTRIBUTOR should be construed as agreements independent of any other provisions of this Agreement, and the existence of any claim or cause of action by DISTRIBUTOR against the COMPANIES whether predicated upon this

13

Agreement or otherwise will not constitute a defense to the enforcement by the COMPANIES of these covenants.

(c)     Construction of Covenants. In the event the restrictive covenants (non-compete, non-solicitation, confidentiality and non-disclosure provisions) set forth above are held by any court or other duly constituted legal authority to be effective in any particular area or jurisdiction only if modified to limit their duration or scope, or to be void or otherwise unenforceable in any particular area or jurisdiction, then such provisions will be deemed to be amended and modified with respect to that particular area or jurisdiction so as to comply with the order of any such court or other duly constituted legal authority, and as to all other areas and jurisdictions, such provisions will remain in full force and effect as set forth in this Agreement. The parties further agree that, in the event the enforceability of any of the provisions of this Agreement may depend on separate or additional compensation or payments to be paid therefore, that the COMPANIES have the right to offer such compensation or payments so as to obtain enforceability as to such provisions.

(d)     Survival of Covenants. DISTRIBUTOR acknowledges and agrees that the foregoing restrictive covenants (non-compete, non-solicitation, confidentiality and non-disclosure provisions) will survive any expiration or termination of this Agreement for any reason whatsoever.

11.     TRADEMARKS AND TRADE NAMES.

(a)     DISTRIBUTOR recognizes the value and validity of the Company Intellectual Property, and acknowledges that the Company Intellectual Property is the sole property of the COMPANIES. Except as expressly granted herein, DISTRIBUTOR gains no license or proprietary rights in the Company Intellectual Property, and agrees that DISTRIBUTOR will not infringe upon, dilute, disparage or harm the COMPANIES' rights therein.

(b)     DISTRIBUTOR will not use the Company Intellectual Property in any manner, including in any advertisements, brochures, displays, designs, posters, samples and other materials, without submitting such proposed use and specimens thereof to the COMPANIES for their prior written approval. In the event DISTRIBUTOR desires to advertise that it is a distributor or a delivery agent of the COMPANIES, it will first secure their written consent as to the form, content and media of such advertisement.

(c)     DISTRIBUTOR hereby assigns to the COMPANIES, their designees, successors and assigns, all right, title and interest that DISTRIBUTOR may have or acquire in or to any intangible or intellectual property of any kind that it develops or improves (jointly or alone) with the use of the Company Intellectual Property, the COMPANIES' materials, the Branded Products, the Additional Products, facilities or

14

confidential information, resulting from or suggested by its performance of its obligations hereunder, in any way relating to the Branded Products or the Additional Products or prepared for the purpose of advertising or promoting the sale of Branded Products or the Additional Products. Upon the COMPANIES' request, DISTRIBUTOR will execute and deliver any assignment or related documents or instruments reasonably requested by the COMPANIES for the purpose of developing or protecting such property, or to assign all DISTRIBUTOR'S and any third party's rights, if any, in such property to the COMPANIES. DISTRIBUTOR hereby appoints the COMPANIES, with the power of substitution, as its attorney-in-fact to execute any assignments, documents or instruments for the purpose of developing or protecting such property.

(d)     Upon termination of this Agreement, DISTRIBUTOR agrees to discontinue immediately all use of the Company Intellectual Property and DISTRIBUTOR will immediately remove any and all references to the Company Intellectual Property from DISTRIBUTOR's delivery vehicles, equipment displays and promotional materials. Upon expiration or termination hereof for any reason whatsoever, DISTRIBUTOR will deliver to the COMPANIES all advertisements, brochures, displays, designs, posters, samples, employee uniforms, promotional items and other materials relating or referring to the Branded Products or the Additional Products, to the COMPANIES or to the Company Intellectual Property then in DISTRIBUTOR's possession or control.

(e)     DISTRIBUTOR will promptly inform the COMPANIES in writing of any infringement of the Company Intellectual Property, or any claim or allegation that the Company Intellectual Property infringes any rights of any other person. DISTRIBUTOR will have no right to maintain or defend any action on behalf of the COMPANIES.

(f)     DISTRIBUTOR will not use any of the Company Intellectual Property or parts thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or as a domain name, or in any other manner without the express prior written consent of the COMPANIES, which may be withheld in their sole discretion. DISTRIBUTOR will not attempt to register or register any of the COMPANIES' trademarks or any mark or name closely resembling them nor seek copyright registration of any materials relating to Branded Products or the Additional Products or prepared for the purpose of advertising or promoting the sale of Branded Products or the Additional Products. Upon request, DISTRIBUTOR agrees to cooperate with and assist the COMPANIES, at their expense, in the protection of trademarks, patents, or copyrights owned by or licensed to the COMPANIES.

12.     RESERVED RIGHTS. In addition to the other rights reserved by the COMPANIES as set forth in this Agreement, the COMPANIES reserve the following rights, which they may, without incurring any liability to DISTRIBUTOR, exercise at any time in their sole and absolute discretion: (a) to modify, discontinue or introduce

15

new, different or additional Products for resale; (b) to reduce, limit or cancel any order from DISTRIBUTOR for a valid business reason; (c) to establish and adjust suggested retail prices for the Branded Products and the Additional Products or to establish and adjust any discount associated with the COMPANIES' pricing for the Branded Products and Additional Products; and (d) to sell Branded Products and Additional Products to any person, including other agents, distributors or customers, any Customer or House Account within or without the Territory in accordance with the terms hereof, and to send sales agents into the Territory to promote the sale of Branded Products and Additional Products within the Territory.

13.    INSURANCE.

(a)    DISTRIBUTOR Requirements. DISTRIBUTOR will, at its sole expense and at all times during the term of this Agreement, maintain comprehensive general liability insurance for injury to or death of any person or persons and for damage to property, all of which insurance will be with such coverages and in such amounts as required by the laws of any jurisdictions in which DISTRIBUTOR conducts business (except that the comprehensive general liability insurance shall provide a minimum coverage of $1,000,000 per occurrence and $5,000,000 in the aggregate), which insurance coverage will be with insurance companies authorized to do business in the states in which DISTRIBUTOR operates. All such insurance will name the COMPANIES as additional insureds and provide that 30 days' written notice must be given to the COMPANIES prior to any cancellation or material amendment of any of the terms of such coverage. DISTRIBUTOR will deliver to the COMPANIES certificates of insurance evidencing such coverage prior to the effective date of this Agreement and upon policy renewals, and at such other times as the COMPANIES may reasonably request. All coverages required by this Section 13(a) are minimum amounts and do not constitute a recommendation to DISTRIBUTOR as to the amount and types of insurance coverage that DISTRIBUTOR should maintain.

(b)    COMPANIES Requirements. The COMPANIES will, at their sole cost and expense and at all times during the term of this Agreement, maintain commercial general liability insurance, including product liability coverage, providing coverage of up to $1,000,000 per occurrence and $10,000,000 in the aggregate, which insurance will name DISTRIBUTOR as an additional insured. Such coverage will provide that 30 days' written notice must be given to DISTRIBUTOR prior to any cancellation or material amendment of any of the terms of such coverage. The COMPANIES will deliver to DISTRIBUTOR certificates of insurance evidencing such coverage prior to the effective date of this Agreement and upon policy renewals, and at such other times as DISTRIBUTOR may reasonably request. In addition upon request by DISTRIBUTOR to the extent commercially reasonable, the COMPANIES will cause such insurance policies to name certain Customers or House Accounts as additional insureds.

16

14.    RELATIONSHIP OF PARTIES.  The daily business operations of DISTRIBUTOR under this Agreement are subject to the sole control and management of DISTRIBUTOR.  DISTRIBUTOR is an independent business operation, and DISTRIBUTOR is performing its obligations under this Agreement only as an independent contractor.  Except as otherwise specifically provided herein, nothing in this Agreement may be construed to create the relationship of principal and agent, employer and employee, franchisor and franchisee, or joint venturers, between or among any of the parties hereto.  No party to this Agreement may act or represent itself, directly or by implication, as an agent of any of the other parties, and no party will have any power or authority to bind or obligate any other party; provided that the COMPANIES hereby designate Fresh Juice to act as their agent with respect to dealings with DISTRIBUTOR in the ordinary course of business under this Agreement.

15.    INDEMNIFICATION.

(a)    Indemnification by DISTRIBUTOR.  DISTRIBUTOR will defend, indemnify and hold harmless each of the COMPANIES, their affiliates, and respective officers, directors, employees, agents, advisers and representatives (collectively, the "Company Indemnitees") from and against, and pay or reimburse the Company Indemnitees for, any and all claims, demands, liabilities, obligations, losses, fines, costs, expenses, royalties, litigation, deficiencies or damages (whether absolute, accrued, conditional or otherwise and whether or not resulting from third party claims), including interest and penalties with respect thereto and out-of-pocket expenses and reasonable attorneys' and accountants' fees and expenses incurred in the investigation or defense of any of the same or in asserting, preserving or enforcing any of their respective rights hereunder or under any other agreement with any COMPANY (collectively, "Losses"), resulting from or arising out of:

(i)    any material inaccuracy of any representation or warranty when made or deemed made by DISTRIBUTOR herein or under any other agreement with any COMPANY, or with respect to the Products (including the Branded Products) or the Additional Products, or in connection herewith or therewith; or

(ii)    any failure of DISTRIBUTOR to perform any material covenant or agreement hereunder or under any other agreement with any COMPANY or fulfill any other material obligation in respect hereof or thereof.

(b)    Indemnification by the COMPANIES.  The COMPANIES will defend, indemnify and hold harmless DISTRIBUTOR, its affiliates, and their respective officers, directors, employees, agents, advisers and representatives (the "Distributor Indemnitees") from and against and pay or reimburse the Distributor Indemnities for, any and all Losses (as defined in Section 15(a) above) resulting from or arising out of:

(i)     any material inaccuracy in any representation or warranty when made or deemed by any COMPANY herein or under any other agreement with DISTRIBUTOR or with respect to the Products (including the Branded Products) or the Additional Products, or in connection herewith or therewith; or

(ii)     any failure of any COMPANY to perform any material covenant or agreement hereunder or under any other agreement with DISTRIBUTOR or fulfill any other material obligation in respect hereof or thereof.

(c)     Third Party Indemnification Procedures.  In the case of any claim asserted by a third party against a person entitled to indemnification under this Agreement (the "Indemnified Party"), the Indemnified Party will give notice to the person required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party will permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided, that (i) counsel for the Indemnifying Party who conducts the defense of such claim or litigation will be reasonably satisfactory to the Indemnified Party, and the Indemnified Party may participate in such defense at such Indemnified Party's expense, and (ii) the failure of any Indemnified Party to give notice as provided herein will not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such failure results in a lack of actual notice to the Indemnifying Party and such Indemnifying Party is materially prejudiced as a result of such failure to give notice.  Except with the prior written consent of the Indemnified Party, no Indemnifying Party, in the defense of any such claim or litigation, may consent to entry of any judgment or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation.  In the event that the Indemnified Party in good faith determines that the conduct of the defense of any claim subject to indemnification hereunder or any proposed settlement of any such claim by the Indemnifying Party might be expected to affect adversely the Indemnified Party's tax liability or the ability of the COMPANIES to conduct the Companies' Business, or that the Indemnified Party may have available to it one or more defenses or counterclaims that are inconsistent with one or more of those that may be available to the Indemnifying Party in respect of such claim or any litigation relating thereto, the Indemnified Party has the right at all times to take over and assume control over the defense, settlement, negotiations or litigation relating to any such claim at the sole cost of the Indemnifying Party, provided, that if the Indemnified Party does so take over and assume control, the Indemnified Party may not settle such claim or litigation without the written consent of the Indemnifying Party, such consent not to be unreasonably withheld or delayed.  In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party has the full right to defend against any such claim or

demand, and will be entitled to settle or agree to pay in full such claim or demand. In any event, the parties will, and will cause each of their affiliates that is an Indemnified Party or an Indemnifying Party to, cooperate in the defense of any claim or litigation subject to this Section 15 and the records of each will be available to the other with respect to such defense.

16.    TERM. The term of this Agreement will commence on the date hereof for an initial term of approximately ten years and will terminate effective February 28, 2011 unless sooner terminated in accordance with its terms, and will be automatically renewed for successive one year terms unless written notice is delivered by one of the parties to the other at least 90 days prior to the expiration of the initial term or any renewal term of the Agreement.

17.    TERMINATION.

(a)    Termination Without Cause. At any time, upon 60 days' prior written notice to DISTRIBUTOR, the COMPANIES may terminate this Agreement without cause ("Without Cause Termination"). On or prior to the effective date of a Without Cause Termination, the COMPANIES will pay to DISTRIBUTOR the sum of (i) all accrued but unpaid commissions owed to DISTRIBUTOR under Section 3(b); *minus* (ii) all outstanding amounts owed by DISTRIBUTOR to the COMPANIES hereunder, whether for Products (including Branded Products), Additional Products or otherwise *plus* (iii) the Termination Fee in effect on the effective date of termination of this Agreement. The Termination Fee will be calculated as of the effective date of any Without Cause Termination and initially will equal $2.5 million. Beginning on March 1, 2004, the Termination Fee will decline monthly by $20,833.33 until February 28, 2011, after which no Termination Fee will be payable for a Without Cause Termination. DISTRIBUTOR and the COMPANIES agree that the Termination Fee constitutes reasonable compensation to DISTRIBUTOR for a Without Cause Termination will constitute full satisfaction of all obligations then owed to DISTRIBUTOR under this Agreement.

(b)    Termination for Cause. Unless an express cure period is set forth herein, DISTRIBUTOR acknowledges and agrees that the COMPANIES may immediately terminate this Agreement upon written notice to DISTRIBUTOR, and all rights of DISTRIBUTOR herein will cease, upon the occurrence of any one of the following events (each, a "Termination for Cause"):

(i)    DISTRIBUTOR fails to make or deliver any payment owed to the COMPANIES in accordance with the terms and conditions of this Agreement or any other agreement between the parties and such failure is not cured the later to occur of (i) 30 days after such payment was due or (ii) five business days after any COMPANY gives DISTRIBUTOR written notice of non-payment;

(ii)     After notice and a reasonable opportunity to cure such failure, DISTRIBUTOR fails to perform in any material respect any obligations under this Agreement or under any other Agreement DISTRIBUTOR may have with the COMPANIES, or breaches any of its material obligations or covenants hereunder, including the restrictive covenants herein;

(iii)     DISTRIBUTOR fails to purchase at least 20,000 gallons of Product per month for three successive months;

(iv)     DISTRIBUTOR intentionally or recklessly sells or delivers any Products or Additional Product outside the Territory without obtaining prior written authorization from the COMPANIES;

(v)     After notice and a reasonable opportunity to cease such activities, DISTRIBUTOR materially interferes with the business of another distributor or delivery agent acting on behalf of the COMPANIES other than, with respect to non-exclusive distribution rights hereunder, normal competitive activities;

(vi)     DISTRIBUTOR commits any material act of dishonesty with respect to the COMPANIES, any House Account serviced by DISTRIBUTOR or any Branded Product or Additional Product distributed by DISTRIBUTOR or DISTRIBUTOR is convicted of a felony relating to DISTRIBUTOR's business;

(vii)     DISTRIBUTOR intentionally or recklessly commits any act that materially impairs the goodwill associated with the COMPANIES or the Company Intellectual Property or other trademark, trade name, service mark, logo, or other commercial symbol of the COMPANIES or after written notice to cease such remarks, makes any malicious disparaging remarks on an on-going basis about the COMPANIES, the Companies Business, the COMPANIES' reputation, competence or character or about any of their directors, officers or employees;

(viii)     In the event of the liquidation or insolvency of DISTRIBUTOR or an assignment by DISTRIBUTOR for the benefit of all or substantially all of the creditors of DISTRIBUTOR; provided that the COMPANIES will not terminate this Agreement under this Section 17(b)(viii) if DISTRIBUTOR immediately pays all outstanding amounts owed to the COMPANIES hereunder and continues to pay for any New Products or Additional Products hereunder on a cash-on-delivery basis;

(ix)     Any transfer or assignment of this Agreement, or any interest herein, by DISTRIBUTOR other than in accordance with the terms hereof.

(c)    Effect of Expiration or Termination.  No Termination Fee will be payable in connection with a Termination for Cause.  Upon termination of this Agreement, DISTRIBUTOR will immediately return to the COMPANIES all advertising and marketing materials related to the COMPANIES, the Branded Products and the Additional Products that are in the possession of DISTRIBUTOR for which payment has not been received, and discontinue using any Company Intellectual Property or otherwise holding itself out as a distributor of the Branded Products or the Additional Products. Any expiration or termination of this Agreement will not affect DISTRIBUTOR's obligation to pay, or the COMPANIES' right to be paid for invoices for Products and Additional Products already delivered to DISTRIBUTOR or the COMPANIES' rights to any credits or payments owed or accrued to the date of expiration or termination.  The COMPANIES' right to credits upon expiration or termination of this Agreement will include credits against which DISTRIBUTOR would, but for such expiration or termination, be required to apply to future purchases.

18.    RELEASE AND TERMINATION.  Fresh Juice and DISTRIBUTOR acknowledge and agree that this Agreement amends and restates in full the Original Agreement and that its terms have no further force or effect.  Each of the COMPANIES and DISTRIBUTOR for the benefit themselves, their predecessors, successors, affiliates and assigns hereby release and forever discharge the others, their parent companies, affiliates, subsidiaries, and their respective officers, directors, employees, successors, and assigns and holds each of them harmless from and against any and all loss, damage (including incidental, special, punitive and consequential damages), cost, expense (including court costs and attorneys' fees and expenses and costs of investigation), suit, action, claim, deficiency, liability or obligation caused by or arising from or related to an agreement or an event occurring prior to the date hereof, whether known or unknown, including with respect to the Original Agreement.

19.    MISCELLANEOUS.

(a)    Notices.  All notices or other communications under this Agreement will be in writing and be given (and will be deemed to have been duly given upon receipt) by delivery in person, by facsimile, overnight courier service or certified mail, postage prepaid, return receipt requested, addressed as follows:

(i)    If to Fresh Juice, to it at:

c/o M. H. Zeigler and Sons, Inc.
1513 North Broad Street
Lansdale, PA 19446
Telecopy: (215) 855-4548
Telephone: (215) 855-5161
Attention: President

21

(ii)   If to Orchid Island, to it at:

      330 North U.S. Highway 1
      Fort Pierce, FL 34950-4297
      Telecopy: (561) 465-4303
      Telephone: (561) 465-1122
      Attention: John Martinelli

(iii)   If to CDF, to it at:

      533 West Foothill Blvd.
      Glendora, CA 91741
      Telecopy: (626) 852-2560
      Telephone: (626) 852-2500
      Attention: David Sperry

(iv)   If to Fantasia, to it at:

      Fantasia Fresh Juice Company
      5617 North Pearl
      Rosemont, IL 60018
      Telecopy: (847) 928-0634
      Telephone: (847) 671-3990
      Attention: Tom Hicks

(v)   If to MHZ, to it at:

      M. H. Zeigler and Sons, Inc.
      1513 North Broad Street
      Lansdale, PA 19446
      Telecopy: (215) 855-4548
      Telephone: (215) 855-5161
      Attention: President

      In each case above, with a copy to:

      North Castle Partners, L.L.C.
      60 Arch Street
      Greenwich, CT 06830
      Telecopy: (203) 618-1860
      Telephone: (203) 862-3200
      Attention: Peter J. Shabecoff

(vi)   If to Distributor, to it at:

22.

Natural Juice Company
550 Clayton Ct.
Wood Dale, IL 60191
Attention: Brian Duffy
Facsimile: (630) 350-2050

Any party may from time to time change its address for notification purposes by giving the other parties written notice of the new address and the date upon which it will become effective.

(b)    Assignment. Except as otherwise provided herein, this Agreement may not be transferred or assigned by any party hereto without the prior written consent of the other parties, except that the COMPANIES may assign this Agreement to any of their affiliates without the prior written consent of DISTRIBUTOR. Notwithstanding the foregoing, DISTRIBUTOR may transfer in whole or in part any interest in DISTRIBUTOR's business for estate planning purposes or to any party that is not a principal competitor of the COMPANIES. In the event any such transfer (other than a transfer for estate planning purposes) occurs prior to March 1, 2008, the initial term of this Agreement will be shortened to three years from the date of such transfer and the Termination Fee will be reduced to $1 million, thereafter declining monthly by $20,833.33 until the third anniversary of such transfer, after which no Termination Fee will be payable for a Without Cause Termination. Any transfer or assignment except as provided in this Section 19(b) will be void and unenforceable and will constitute grounds for a Termination for Cause by the COMPANIES.

(c)    Survival of Terms. Expiration or termination of this Agreement for any reason will not release any party from its liabilities or obligations under this Agreement that (i) the parties have expressly agreed will survive any such expiration or termination, or (ii) remain to be performed or by their nature would be intended to be applicable following any such expiration or termination.

(d)    Counterparts: Facsimile Execution. This Agreement may be executed in several counterparts, and by facsimile, each of which counterparts will constitute an original and all of which taken together shall constitute one single agreement between the parties.

(e)    Headings. The paragraph and section headings used in this Agreement are for reference and convenience only and may not affect the interpretation of this Agreement.

(f)    Severability. If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both parties will be relieved of all obligations arising under such provision, it being the intent and

23

agreement of the parties that this Agreement will be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent.

(g)  Waiver.  A waiver by either of the parties of any covenants, conditions or agreements to be performed by the other party or any breach thereof may not be construed to be a waiver of any succeeding breach thereof or of any other covenant condition or agreement herein contained.

(h)  Remedies.  All remedies set forth in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise, and may be enforced concurrently or from time to time.

(i)  Successors; Assigns and Affiliates.  This Agreement will be binding upon and inure to the benefit of the parties hereto, their successors, assigns and affiliates, other than affiliates of the COMPANIES that are not engaged in the Companies Business.  The parties agree to amend this Agreement as necessary to add any new affiliates of the COMPANIES or of North Castle Partners, L.L.C. that manufacture or distribute Products in the Territory after the date hereof.

(j)  Entire Agreement.  This Agreement, including any memoranda, exhibits and documents referred to in this Agreement or attached hereto, constitutes the entire and exclusive statement of Agreement between the parties with respect to its subject matter. There are no oral or written representations, understandings or agreements relating to this Agreement that are not fully expressed herein, including, the Original Agreement and any distribution or other agreement between the parties related to the purchase or sale of the Products, all of which agreements are hereby terminated and superceded by this Agreement and are of no further force or effect.  The parties agree that unless otherwise agreed to in a writing signed by the party intended to be bound, the terms and conditions of this Agreement will prevail over any contrary terms in any purchase order, sales acknowledgment, confirmation or any other document issued by either party affecting the purchase or sale of Products hereunder.  This Agreement may be modified or rescinded only by a writing signed by the parties hereto.

(k)  Governing Law; Venue; Waiver of Jury Trial.  This Agreement will be governed by and construed in accordance with the laws of the State of Illinois.  THE PARTIES HEREBY WAIVE ANY RIGHT TO A JURY TRIAL WITH RESPECT TO ANY MATTER ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(l)  Counsel Review.  EACH PARTY ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO SEEK THE ADVICE OF COUNSEL PRIOR TO ENTERING INTO THIS AGREEMENT, AND AGREES THAT THIS AGREEMENT

HAS BEEN FULLY NEGOTIATED AND AGREED UPON BY THE PARTIES.
FURTHER, THE AGREEMENT IS NOT TO BE CONSTRUED AGAINST THE
DRAFTER OF THE DOCUMENT BECAUSE SUCH PARTY DRAFTED THE
DOCUMENT AS THEY HAVE DONE SO MERELY FOR THE CONVENIENCE OF
THE PARTIES.

IN WITNESS WHEREOF, the parties have each caused this Agreement to be signed and delivered by its duly authorized officer or representative as of the date set forth above.

FRESH JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

ORCHID ISLAND JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

CALIFORNIA DAY-FRESH FOODS, INC.

By: _____
    Name: Peter Shabecoff
    Title: Vice President

FANTASIA FRESH JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

M.H. ZEIGLER AND SONS, INC.

By: _____
    Name: Peter Shabecoff
    Title: Vice President

NATURAL JUICE COMPANY

By: _____
    Name: Brian Duffy
    Title: President

26

IN WITNESS WHEREOF, the parties have each caused this Agreement to be signed and delivered by its duly authorized officer or representative as of the date set forth above.

FRESH JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

ORCHID ISLAND JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

CALIFORNIA DAY-FRESH FOODS, INC.

By: _____
    Name: Peter Shabecoff
    Title: Vice President

FANTASIA FRESH JUICE COMPANY

By: _____
    Name: Peter Shabecoff
    Title: Vice President

M.H. ZEIGLER AND SONS, INC.

By: _____
    Name: Peter Shabecoff
    Title: Vice President

NATURAL JUICE COMPANY

By: _____
    Name: Brian Duffy
    Title: President

# EXHIBITS

Exhibit A – Company Intellectual Property

## EXHIBIT A

### COMPANY INTELLECTUAL PROPERTY

Berry Naked
Chromium Crusher
Earth Juice
Gardena
Green Dream
Green Machine
Green Mix
Mango Me
Mighty Mango
Mojave Magic
Naked
Naked Blueberry Booster
Naked Foods Freshest Foods Alive
Naked Fruit
Naked in Paradise
Naked Nectar
Naked Salad
Naked Salsa
Naked Sauce
Naked Shake
Naked Sunrise
Naked Super Juice
Protein Colada
Protein Zone
Purple Power
Rainbow Fresh Juices
Salad in a Bottle
Spirulina Sunshine
Super Sixteen
Tangerine Scream
Tidal Wave
True Nature
Turbo C
U-Like Juice
Vita bang 16
Vital Veggie
Well Being
Zippitea

Fresh Pik't
Just Pik't

Saratoga Spring Water
Aquassential
Frooja
Fruits with Roots
Jango's
Saratoga Spring Water
Saratoga Splash
Saratoga Classics
Ultimate

Zeigler's
Taste the Ultimate Difference
The Ultimate Juice
The Ultimate Taste
Ultimate Gourmet
Hansen's Fresh Juices
The Ultimate Country Kitchen
Zeigler's Our 50 Year History of Blending Wholesale and Nutritious Apples and Design

Advanced Citrus
As Fresh as the Speed Limit Allows
As Fresh as the Speed Limit Will Allow
Big'n Beta
Big Rush
Capital C
Drink Your Fruit!
Fresh Fruit Rush
Fruit Rush
Javalicious
Juicie Cubes
Monster Mango
Napa Naturals
Presentation
Primative Papaya
Rave
RxSources
Sonoma Juices
Sonoma Naturals

LAW OFFICES

# FIGLIULO & SILVERMAN

A PROFESSIONAL CORPORATION

TEN SOUTH LASALLE STREET
SUITE 3600
CHICAGO, ILLINOIS 60603

TELEPHONE
(312) 251-4600

FACSIMILE
(312) 251-4610

www.fslegal.com

PETER A. SILVERMAN
(312) 251-5275

PSILVERMAN@FSLEGAL.COM

October 31, 2003

Via Facsimile

Richard M. Carnell, Jr.
BERNARD EGAN & COMPANY
1900 Old Dixie Highway
Fort Pierce, Florida 34946

Re:     Exclusive supply and distributor agreement for citrus juice products

Dear Mr. Carnell:

We represent Natural Juice Company ("Natural Juice") in connection with the pricing and other issues that have been the subject of correspondence between and among representatives of Natural Juice, Orchid Island Juice Company ("Orchid Island") and Ultimate Juice Company ("Ultimate"). Your letter of yesterday to Frank Howard has been forwarded to our attention.

As you know, the parties are bound by the Amended and Restated Exclusive Supply and Independent Distributor Master Agreement ("Contract"). The Contract was entered into in connection with settlement of litigation previously initiated by Natural Juice to enforce the terms of its supply agreement with Fresh Juice Company. In consideration for dismissing its claims, Natural Juice was provided with favorable pricing terms under the Contract. Based on the words and actions of Orchid Island and Ultimate representatives, it is apparent that they are attempting to avoid contract terms that are favorable to Natural Juice.

As to the issue of credits, Natural Juice has demonstrated, based on records provided by Orchid Island, that Natural Juice is owed $38,000 under the contract. Orchid Island's claim that it is owed $40,000 is clearly not well-based under the contract.

Orchid Island's position that it may simply supply products to Natural Juice from third parties to avoid the pricing terms that are favorable to Natural Juice is contrary to the plain terms of the contract.

Unless Orchid Island provides adequate assurances that it intends to perform under the contract, including payment of amounts owed to Natural Juice and an assurance that products will be supplied by Orchid Island at the price required under the contract,

**2**

LAW OFFICES

# FIGLIULO & SILVERMAN

Richard M. Carnell, Jr.
10/31/2003
Page 2 of 2

Natural Juice will seek remedies for Orchid Island's wrongful breach of contract, including recovery of the termination fee due under the contract.

Very truly yours,

Peter A. Silverman

cc:     John Martinelli

Case: 1:03-cv-09154 Document #: 1 Filed: 12/18/03 Page 46 of 49 PageID #:46

@001

# BERNARD EGAN & COMPANY

1900 OLD DIXIE HIGHWAY  •  FORT PIERCE, FLORIDA 34946-1423

(772) 465-7555  •  (772) 567-8331  •  FAX (772) 460-5012

November 4, 2003

Peter A. Silverman, Esquire                     <u>Facsimile Only</u>
Figliulo & Silverman                             (312) 251-4610
Ten South LaSalle Street, Suite 3600
Chicago, Illinois 60603

      Re:  Natural Juice Co. Agreement

Dear Mr. Silverman:

      This is in response to your two letters dated October 31, 2003.

      Please be assured that Orchid Island Juice Company intends to perform pursuant to the Agreement.  Marygrace Sexton is calling Mr. Duffy to schedule a pricing conference.

      John Martinelli is no longer associated with Orchid Island Juice Company; therefore, it is unnecessary to carbon copy him on your letters.

      Sincerely,

      Richard M. Carnell, Jr.
      General Counsel

RMC/keh

LAW OFFICES

# FIGLIULO & SILVERMAN

A PROFESSIONAL CORPORATION

TEN SOUTH LASALLE STREET
SUITE 3600
CHICAGO, ILLINOIS 60603

TELEPHONE
(312) 251-4600

FACSIMILE
(312) 251-4610

www.fslegal.com

PETER A. SILVERMAN
(312) 251-5275

PSILVERMAN@FSLEGAL.COM

November 13, 2003

Via Facsimile

Richard M. Carnell, Jr.
BERNARD EGAN & COMPANY
1900 Old Dixie Highway
Fort Pierce, Florida 34946

**Re:    Exclusive supply and distributor agreement for citrus juice products**

Dear Mr. Carnell:

In response to our demand for reasonable assurances, Orchid Island Juice Company ("Orchid Island") has stated that it is unwilling to pay the approximate $33,000 owed to Natural Juice Company ("Natural Juice") and that Orchid Island refuses to sell product to Natural Juice Company at the contract price. Orchid Island has breached and repudiated the parties' contract. Natural Juice will use an alternative supplier and will pursue all available remedies against Orchid Island resulting from Orchid Island's breach and repudiation of the contract.

Very truly yours,

Peter A. Silverman

Civil Cover Sheet

Page 1 of 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

## Civil Cover Sheet

03C 9154

JUDGE LEINENWEBER

MAGISTRATE SIDNEY I. SCHENKIER

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** Natural Juice Company

County of Residence: Cook

Plaintiff's Atty:
Peter A. Silverman
Figliulo & Silverman
10 S. LaSalle Street, Suite 3600
(312) 251-4600

**Defendant(s):** Orchid Island Juice Company

County of Residence:

Defendant's Atty:
Peter G. Rush, Paul J.
Walsen, Abram I. Moore
Bell, Boyd & Lloyd, LLC
70 W. Madison, Suite 3000
(312) 372-1121

II. Basis of Jurisdiction: **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
 Plaintiff:- **4 IL corp or Principal place of Bus. in IL**
 Defendant:- **5 Non IL corp and Principal place of Business outside IL**

IV. Origin : **2. Removed From State Court**

V. Nature of Suit: **190 Other Contract**

VI.Cause of Action: **Diversity of Citizenship, 28 U.S.C. § 1332**

VII. Requested in Complaint
 Class Action: No
 Dollar Demand: **over $75,000**
 Jury Demand: No

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 12/18/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.** Revised: 06/28/00

12/18/2003

*UNITED STATES DISTRICT COURT*

JUDGE LEINENWEBER

NORTHERN DISTRICT OF ILLINOIS

MAGISTRATE SIDNEY I. SCHENKIER

In the Matter of   Natural Juice Company v. Orchid Island Juice Company

Case Number: **03C 9154**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Orchid Island Juice Company

| (A) | (B) |
|---|---|
| SIGNATURE *Peter G. Rush* | SIGNATURE |
| NAME Peter G. Rush | NAME Paul J. Walsen |
| FIRM Bell, Boyd & Lloyd LLC | FIRM Bell, Boyd & Lloyd LLC |
| STREET ADDRESS 70 West Madison, Suite 3000 | STREET ADDRESS 70 West Madison, Suite 3000 |
| CITY/STATE/ZIP Chicago, IL  60602 | CITY/STATE/ZIP Chicago, IL  60602 |
| TELEPHONE NUMBER (312) 807-4352 | TELEPHONE NUMBER (312) 807-4388 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6201818 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6226318 |
| MEMBER OF TRIAL BAR?   YES [X]   NO [ ] | MEMBER OF TRIAL BAR?   YES [X]   NO [ ] |
| TRIAL ATTORNEY?   YES [X]   NO [ ] | TRIAL ATTORNEY?   YES [ ]   NO [X] |
| DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [X] | DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [X] |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME Abram I. Moore | NAME |
| FIRM Bell, Boyd & Lloyd LLC | FIRM |
| STREET ADDRESS 70 West Madison, Suite 3000 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL  60602 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 781-6010 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6278871 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES [ ]   NO [X] | MEMBER OF TRIAL BAR?   YES [ ]   NO [ ] |
| TRIAL ATTORNEY?   YES [ ]   NO [X] | TRIAL ATTORNEY?   YES [ ]   NO [ ] |
| DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [X] | DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [ ] |

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**